UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS SUDZ,

               Petitioner,           Case No. 4:25-cv-10195
                                          Hon. F. Kay Behm

v.

ADAM DOUGLAS,

               Respondent.

_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND (2) DENYING CERTIFICATE OF APPEALABILITY**

Thomas Sudz filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Sudz is a Michigan prisoner serving a life sentence for his Oakland Circuit Court conviction of first-degree premeditated murder. Sudz claims that his federal constitutional rights were violated when the jury was not instructed on the defense of automatism. For the reasons that follow, the Court denies the petition and denies a certificate of appealability.

I. Facts and Procedural History

The charges against Sudz arose from the brutal stabbing death of his wife, Beth Alsup-Sudz. The Michigan Court of Appeals summarized the evidence presented at trial:

> The evidence at trial indicated that Beth was having an affair before her death and may have been making arrangements to leave defendant. Defendant became severely depressed upon learning of the affair in the fall of 2018. On February 5, 2019, defendant's primary care physician prescribed sertraline—a serotonin selective reuptake inhibitor (SSRI) antidepressant—an additional non-SSRI

antidepressant (trazadone), and an anxiety sedative (temazepam). Approximately three weeks later, defendant was involuntarily hospitalized for psychiatric treatment on February 24, 2019. He complained about the side effects he was experiencing during his hospitalization, prompting the attending physician to prescribe a second non-SSRI antidepressant (mirtazapine) in lieu of the sertraline. Defendant was discharged on February 28, 2019. At the time of Beth's murder, however, defendant had purportedly stopped taking the antidepressants.

The police conducted a welfare check at Beth's and defendant's home on March 17, 2019. Beth was discovered dead in their bed, with obvious signs of severe head trauma. She had been stabbed at least 20 times with such force that the wounds crushed and fractured portions of her skull. Beth also sustained classic defensive injuries, namely, a number of stab wounds, superficial cuts, and contusions on her arms and hands. Defendant was found on the floor of the bedroom, unconscious from an apparent overdose of prescription medications. A urinalysis conducted at the hospital reflected benzodiazepines and ecstasy in defendant's system, though defendant denied using illegal drugs, and a defense expert indicated that a metabolite of one of defendant's prescribed medications could be mistaken for ecstasy in a urine screen. In the bathroom adjoining the master bedroom, the police discovered several medication bottles, a clean butcher knife, and a handwritten note that said: "She drove my crazy with all her affairs. Thank you, Patrick Higgins, Alan Ducker, and others."[1] Additionally, blood-stained clothing was found wrapped in a blood-stained towel on the laundry machine in the basement.

Defendant was later examined by several medical or mental health professionals, during which he recounted the events leading up to Beth's death with varying levels of detail. Defendant recalled attending a hockey game with his son during the day on March 16, 2019, and taking two "sleeping pills" later in the evening. Defendant also remembered standing on Beth's side of the bed with a hammer.[2] The next thing he remembered was waking up, seeing blood everywhere, and taking a bunch of pills in order to end his life.

Defendant presented an insanity defense at trial, supported by several experts. Dr. Randall Commissaris, an expert in pharmacology and toxicology, testified regarding the manner in which defendant's various medications could have affected his behavior, focusing primarily on sertraline. Dr. Commissaris cited a 2020 Swedish study that found SSRI antidepressants could cause a slight increase in aggression and

violence and that those effects could persist up to three months after discontinuing the medication. He suggested that the extremely violent nature of the murder, coupled with defendant's longstanding nonviolent history, could be reflective of a person experiencing a rare, severe, and adverse effect of a recently discontinued SSRI antidepressant, especially if those effects were exacerbated by ecstasy. Additionally, defendant's ingestion of temazepam that night would increase the likelihood of retrograde amnesia.

Forensic psychiatry expert Dr. Gerald Shiener noted that defendant was diagnosed with major depression during his February 2019 hospitalization. Dr. Shiener believed that defendant's depression persisted in the weeks following his discharge and was complicated by mild brain atrophy. Dr. Shiener opined that defendant's depression constituted a mental illness that "impaired his ability to appreciate the consequences of his actions, conform them to that effect expected by the law, and to really determine whether he was acting properly or improperly, whether he knew right from wrong." Like Dr. Commissaris, Dr. Shiener reasoned that the sudden emergence of violence so late in defendant's life suggested external factors were at play, including medications, mental illness, and brain disease. An expert in forensic psychology [Steven Miller] likewise opined that defendant had a mental illness at the time of the crime, marked by impaired judgment, difficulty with rational thinking, and an inability to focus, and that defendant's mental illness left him unable to conform his conduct to the requirements of the law.

———

[1]The note also instructed Beth's daughter to take the family cat.
[2]There was no evidence that a hammer was used in the murder.

*People v. Sudz*, No. 359298, 2023 WL 2618197, at *1-2 (Mich. Ct. App. Mar. 23, 2023).

The jury rejected Sudz's insanity defense and found him guilty of first-degree premeditated murder. ECF No. 7-14, at 5. The trial court sentenced him to mandatory life imprisonment. ECF No. 7-15, at 21-22.

Sudz filed a claim of appeal in the Michigan Court of Appeals. His appellate brief raised two claims:

I. The jury should have been instructed on automatism as a defense to the charges. Automatism negates the actus reus and mens rea of the crime and is not barred by the Supreme Court's *Carpenter* ruling.

II. The circuit court erred in allowing the people to belatedly amend their witness list.

ECF No. 7-16, PageID.1918.

The Michigan Court of Appeals affirmed in an unpublished opinion. *Sudz*, No. 359298. Sudz appealed to the Michigan Supreme Court, but his application for leave to appeal was denied by standard form order. *People v. Sudz*, 996 N.W.2d 477 (Mich. 2023) (Table).

## II. Standard of Review

Review of a § 2254 habeas petition is governed by the heightened standard set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254.[1] To obtain relief, habeas petitioners who raise claims adjudicated on the merits by state courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential

---

[1] Contrary to Sudz's assertion, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), did not impliedly overrule AEDPA's standard of review. *See Miles v. Floyd*, 2025 U.S. App. LEXIS 7146, *6-9 (6th Cir. March 25, 2025).

standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted). Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. Discussion

Sudz asserts that he was entitled to a jury instruction on the defense of automatism. The argument is based on a hypothesis regarding Sudz's mental state at the time of the homicide different from the hypothesis offered by his trial attorney and the three expert witnesses who testified in his defense. The defense presented at trial was that Sudz was suffering from severe depression due to his wife's affair, and that the medications he was taking and changing to treat his depression (along with brain atrophy and the possibility that he unknowingly ingested ecstasy) resulted in him experiencing heightened aggression and a lack of impulse control to the point that he was unable to appreciate the wrongfulness or his actions or conform his conduct to the law.

Sudz now claims that characterization is not quite right. Shifting the focus to the evidence indicating that he did not remember the incident and that he is a Viet

Nam veteran, Sudz now claims that he was in a sleepwalking-like state and engaged in unconscious automatic behavior when he stabbed his wife dozens of times. Though this was certainly not the explicitly expressed opinion of any of the experts who testified at trial, Sudz claims that one exchange with one of the defense experts hinted at this hypothesis, and that a jury instruction on automatism was therefore necessary.

On direct appeal, Sudz advanced two legal claims based on this idea. Sudz first claimed that as a matter of due process the trial court erred by failing to instruct the jury on its own regarding automatism because it involved a basic element of the charged offense—that a criminal act be voluntary—and sufficient evidence was presented at trial to support the instruction. ECF No. 7-16, PageID.2257. Second, Sudz claimed that his trial counsel was ineffective for failing to request the additional jury instruction and present the theory alongside the insanity defense. *Id.* PageID.2258-59.

It is important to note that Sudz does *not* argue that his counsel was ineffective for failing to present additional evidence in support of an automatism defense.[2] He does not, for example, claim that his counsel should have questioned the defense experts further about whether the stabbing was the product of automatism. Rather, Sudz only claims that the evidence *already presented at trial* was sufficient in itself to justify the instruction.

---

[2] The only new evidence proffered by Sudz is an affidavit from his trial attorney that she did not consider an automatism defense and would have requested the jury instruction had she been aware the defense existed. ECF No. 1-2, PageID.92.

6

The Court has carefully reviewed the record. It finds that contrary to Sudz's characterization, the evidence presented at trial did not support an automatism defense. The trial court therefore was not required to give an automatism defense instruction on its own, nor was counsel ineffective for failing to request one.

### A. Due Process Claim and Procedural Default

Starting with the due process claim, the Michigan Court of Appeals found that the claim was waived when Sudz expressly agreed that the jury instructions were proper:

> Defendant did not request an automatism instruction at trial, so his claim of instructional error is unpreserved. *See People v. Everett*, 318 Mich. App. 511, 526 (2017). More importantly, after the jury received its instructions, the court inquired whether the parties had any objections, and defendant's attorneys both responded in the negative, thereby waiving direct review of this issue. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v. Carter*, 462 Mich. 206, 215 (2000) (quotation marks and citation omitted). Unlike forfeiture by failure to assert a right in a timely manner, waiver extinguishes any error and precludes appellate review. *Id*. By expressing satisfaction with the instructions provided, counsel waived review of defendant's claim of instructional error. *See id*. at 215, 219....

*Sudz*, 2023 WL 2618197, at *2.

Respondent asserts that review of the due process claim is procedurally defaulted because Sudz did not preserve it in the trial court. ECF No. 6, PageID.259-64.

A claim for relief may be precluded from federal habeas review if a petitioner failed to present the claim to the state courts in accordance with state procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). An issue is considered

procedurally defaulted when (1) the petitioner fails to comply with a state procedural rule, (2) the rule is relied upon by the state courts, and (3) the procedural rule is "independent [of federal law] and adequate." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006). Habeas review of a procedurally defaulted claim is precluded unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Here, all three elements of the procedural default rule are met. First, defense counsel expressly approved of the jury instructions. ECF No. 7-13, at 176. This action violated Michigan's contemporaneous-objection requirement and constituted a waiver of claims regarding the jury instructions. *See People v. Carter*, 462 Mich. 206, 215-16 (2000) (noting that if defense counsel expressly approves the trial court's proposed jury instruction, that approval constitutes a waiver that extinguishes any error). Second, the Michigan Court of Appeals explicitly enforced the waiver rule as grounds for not reviewing Sudz's due process claim. *Sudz*, 2023 WL 2618197, at *2. Finally, the procedural rule in question—that an attorney's express approval of a court's procedure constitutes a waiver on appellate review—is an adequate and independent state ground for decision. *See McKissic v. Birkett*, 200 F. App'x 463, 471 (6th Cir. 2006).

A state prisoner who fails to comply with a state's procedural rule forfeits the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753. Such reasons

ordinarily include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).[3]

Because Sudz claims that his counsel was ineffective for failing to request an automatism instruction, the Court now turns to that issue as both a "cause" argument seeking to excuse the default of the due process claim and as a separate substantive claim seeking habeas relief.

### B. Cause and Ineffective Assistance of Counsel Claim

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the familiar two-prong test for determining whether a criminal defendant received ineffective assistance of trial counsel in violation of the Sixth Amendment. First, a defendant must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, a defendant must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the defendant of a fair proceeding. *Id.*

---

[3] Arguably, an affirmative waiver has a stronger preclusive effect than a mere failure to object, and the waiver eliminates the "cause and prejudice" gateway for review. *See Tackett v. Trierweiler*, 956 F.3d 358, 371 (6th Cir. 2020) (Michigan habeas petitioner waived federal habeas review of jury instruction claim when he affirmatively approved of the instructions); *Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 677-78 (6th Cir. 2018) (explaining that waiver, unlike forfeiture, typically cannot be forgiven). Nevertheless, the Court will assume as Respondent does that the "cause and prejudice" gateway applies here.

To satisfy the performance prong, a defendant must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id*. at 690. The defendant bears the burden of overcoming the presumption that the challenged actions were sound strategy.

As to the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Viewed as a "cause" argument to excuse the procedural default, Sudz's ineffective assistance of counsel claim is reviewed de novo. *See Chase v. MaCauley*, 971 F.3d 582, 592 (6th Cir. 2020) (citing *Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009)); *see also Humphreys v. Emmons*, 223 L. Ed. 2d 137, 140 (2025) (Sotomayor, J. dissenting). Viewed as an independent substantive ground for habeas relief, the claim is reviewed under the deferential AEDPA standard because the Michigan Court of Appeals rejected it on the merits. *Hall*, 563 F.3d at 237.

Because Sudz's ineffective assistance of counsel claim fails under de novo review, he cannot show that his attorney's failure to request an automatism instruction based on the evidence presented at trial excuses his procedural default or provides an independent basis for granting habeas relief.

It is worthwhile at the outset to provide some background on the defense of automatism. In Michigan, where the criminal law derives from the common law, the commission of a crime generally requires both an actus reus (a criminal act) and a mens rea (a criminal state of mind). *See People v. Likine*, 492 Mich. 367, 393-94 (2012).

To satisfy the actus reus requirement, the criminal act must be voluntary. *See* 1 Gillespie Mich. Crim. L. & Proc. § 1:30 (3d ed.). An automatism defense is a claim that though the defendant's body performed the act, it did so in a manner outside conscious control, and the act was therefore not voluntary. "Examples of involuntary acts that, if proved, provide a defense against the actus reus element of a crime include reflexive actions, spasms, seizures or convulsions, and bodily movements occurring while the actor is unconscious or asleep." *Likine*, 492 Mich. at 394.

An insanity defense, by contrast, challenges the mens rea requirement. Under Michigan law, "[l]egal insanity is an affirmative defense requiring proof that, as a result of mental illness or being mentally retarded as defined in the mental health code, the defendant lacked 'substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law.'" *People v. Carpenter*, 464 Mich. 223, 230-231 (2001) (quoting MICH. COMP. LAWS § 768.21a(1)). *Carpenter* found that Michigan's insanity statute

reflected a legislative intent "not to allow a defendant to introduce evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Carpenter*, 464 Mich at 226.

Without clearly stating the bounds between an insanity defense and an automatism defense, the Michigan Court of Appeals in Sudz's appeal assumed that automatism could nevertheless be raised by a defendant based on a mental abnormality:

> While not termed "automatism," the common law clearly precluded criminal convictions premised on automatistic behaviors. And this Court must presume traditional common-law defenses remain available absent a clear legislative intent to the contrary. *People v. Dupree*, 486 Mich 693, 706 (2010). We are bound by *Carpenter's* conclusion that the insanity defense is the sole method of avoiding criminal responsibility on the basis of mental illness, *Carpenter*, 464 Mich. at 239, but an automatism defense turns on the voluntariness of the underlying conduct—not the existence and implications of a mental illness. Indeed, automatism defenses have been raised in instances in which there was no mental illness typically required for an insanity defense. *See* LaFave, § 9.4(b), pp. 41-42 (indicating that some courts have permitted automatism defenses on the basis of epilepsy, stroke, sleepwalking, sleep deprivation, hypnotism, involuntary intoxication, physical trauma, or emotional trauma).

*Sudz*, 2023 WL 2618197, at *4-5.

With this background in mind, the Court turns to the question whether the evidence presented at trial was sufficient to warrant a jury instruction on automatism, and whether Sudz's trial counsel was ineffective for failing to request one. Again, it is important to note that Sudz does not claim that his attorney was ineffective for failing to present additional evidence in support of an automatism

defense. Rather, Sudz only asserts that an instruction on the defense should have been requested because the evidence already presented at trial supported it.

The Court first notes that the nature of the homicide itself did not involve a brief, instantaneous, or reflexive action most commonly associated with involuntary actions. The victim was stabbed more than two dozen times in the head and face, and there were numerous additional defensive wounds on her arms and hands. ECF No. 7-10, at 80-83, 86, 87. This is not a case, for example, where a person claims that he involuntarily loss control of his car and hit a pedestrian because of a sudden seizure. *See, e.g., People v Decina*, 138 N.E.2d 799, 804 (N.Y. 1956). The homicide here involved a prolonged act. What Sudz suggests is that the incident was more in line with involuntary actions that involve "bodily movements occurring while the actor is unconscious or asleep." *Likine*, 492 Mich. at 394.

Because Sudz presented an insanity defense, substantial evidence was presented at trial about his mental state during the incident. The Court finds that none of this testimony, however, suggested that Sudz was engaged in unconscious involuntary action as contemplated by an automatism defense when he killed the victim.

Three defense experts testified at trial. The first one, Randall Commissaris, testified as an expert in pharmacology and toxicology. ECF No. 7-11, at 103. Commissaris testified about possible side effects of three antidepressant drugs Sudz was taking around the time of the incident. *Id.* at 109. Commissaris testified that a Swedish study suggested that some of these medications can result in an increase in

violence in aggression, and that such a side effect can persist after the medications are discontinued. *Id.* at 113, 116, 118. Commissaris testified that Sudz's actions were "not out of the realm of possibility for someone who was experiencing … an adverse or severe rare adverse effect from an SSRI-type antidepressant." *Id.* at 132.

Sudz had also tested positive for the MMDA/ecstasy, and if he was under its influence at the time of the homicide, Commissaris testified that it would have increased the release of serotonin and possibly further increased his aggression and tendency towards violence. *Id.* at 125-26, 133.[4]

With respect to the two benzodiazepine pills Sudz said he took on the night of the incident, "the temazeman … would greatly have increased the likelihood of anterograde amnesia, where you really cannot accurately recall what happened." *Id.*

Commissaris' testimony did not support an automatism defense. According to Commissaris, the anti-depressants (with the possible exacerbating influence of ecstasy) made Sudz aggressive and violent. Commissaris' testimony sought to explain why Sudz's actions were uncharacteristically violent, not that they occurred while he was unconscious. And while Commissaris also testified that the benzodiazepine pills may have caused a lack of memory, he did not testify that a lack of memory also pointed to unconscious action.

---

[4] Commissaris testified that benzodiazepines such as temazepam which Sudz took on the evening of the incident metabolize into a substance that urine-drug screens may report as MDMA/ecstasy. *Id.* at 150. In closing argument, defense counsel suggested that the victim or her daughter plied Sudz with ecstasy without his knowledge for months prior to the incident to alter his behavior and provide a justification for a divorce. ECF No. 7-13, at 136-37. Defense counsel went on to argue that the ecstasy "could explain the unfathomable violence." *Id.* at 138.

Sudz's next expert witness, Gerald Shiener, testified as an expert in forensic psychiatry. *Id.* at 178. Shiener reached essentially the same conclusion as Commissaris. He found that given Sudz's 72-year history of nonviolence, the attack on the victim was likely the result of his starting and stopping antidepressants which can cause "increased restlessness, increased aggression, increased suicidal behavior. And stopping antidepressants suddenly can also cause increased anxiety, increased restlessness." *Id.* at 190-94, 198. Shiener also noted that Sudz likely suffered from frontal-lobe dysfunction due to mild brain atrophy, and it might have been a contributing factor to his actions. *Id.* at 188-90.

Shiener did not testify that Sudz was engaged in unconscious action when he repeatedly stabbed the victim. Rather, like Commissaris, Shiener believed that Sudz met the legal definition of insanity because the medications, brain atrophy, and depression increased his restlessness, aggressiveness, and lack of impulse control. ECF No. 7-13, at 96-99.

Turing to the third defense expert, forensic psychologist Steven Miller testified that Sudz suffered from a major depressive disorder and was suicidal. ECF No. 7-11, at 24. He opined that Sudz was mentally ill as defined in the insanity statute and that he lacked the capacity to appreciate that what he was doing was wrong or to conform his conduct to the law as a result of his illness. *Id.* As with the other two defense expert witnesses, nothing in Miller's testimony suggested that the homicide was the type of involuntary act that amounted to automatism.

There was one exchange during Shiener's rebuttal testimony, however, that invoked the concept of automatism, and this is the passage in the trial record that primarily forms the basis for Sudz's argument. ECF No. 1-1, PageID.47-48. The exchange occurred when Shiener was responding to a question about the prosecution expert's testimony that Sudz's goal-oriented actions immediately after the incident showed that he retained control over his conduct at the time of the incident:

> Q [Defense Counsel]. And then I want to go back to this goal-oriented behavior and just ask one follow-up question. And that is if she were going – if Dr. Toplyn [the prosecution's expert] were going to assign that goal-oriented behavior to the fact that Mr. Sudz had placed the clothes on top of the dryer, by way of her thinking, then one would want to question in terms of you basically said you might come to a conclusion, but you have to look at other facts surrounding it. Shouldn't she have looked at the fact that within arm's length was a washer that he could have put the clothes in and didn't. Is that a factor that one might consider?
>
> A. [Shiener]. No. The real factor is if you think that putting clothes on the dryer and taking off the clothes and changing the clothes were motivated by a desire to avoid responsibility or to remove any evidence of what he'd done, you'd have to ask him. And if all you get is I don't remember doing any of that, and if that – if that's as far as you can get, then you can only speculate, and there's no basis for the speculation, no basis to infer that that would be the reason.
>
> Q. And that also is again exacerbated by the fact that depressed people have disorganized thinking, correct?
>
> A. Depressed people have disorganized thinking. People with brain atrophy have disorganized thinking. People who take two sleeping pills have disorganized thinking, and sleeping pills are known and reported for being what we call amnestic agents. They impair the recollection for the period you're under the influence of that medicine.
>
> The FDA warning for temazepam [the benzodiazepine] ... describes that people engage in complex behavior while under the influence of these medicines without having any recollection afterwards.

Q. For instance, you have probably in your own practice lots of reports about people driving under the influence and not remembering, making meals and eating and not remembering, correct?

A. Sleeping pills are known for and are described by the Food and Drug Administration and their monographs as being capable of causing sleep eating, sleep driving, sleepwalking, and those are—we call them automatisms because while people are partially sedated, they're able to engage in automatic behaviors. And automatic behavior would be you walk up to a door and you know to push it or if the door has a doorknob, you know to grab the doorknob, but you can't make conscious decisions. You can't make rational decisions during that period, and the actions tend to be more aimless.

ECF No. 7-13, at 83-85.

This is the only testimony offered at trial where any of the expert witnesses suggested in any way that the benzodiazepine pills taken by Sudz on the night of the incident might have resulted in some unconscious sleepwalking-like involuntary acts. Importantly, though, and in context, the testimony did not suggest that the homicide itself—the over two dozen blows with the butcher knife—were unconscious acts.

Shiener was specifically responding to the prosecution expert witness's testimony that Sudz's behavior after the stabbing seemed "goal directed." ECF No. 7-13, at 27. The prosecution's expert was referring to Sudz cleaning the butcher knife after the attack and changing out of his bloody clothes and putting them on the dryer. *Id*. To the prosecution's expert, these controlled and organized actions immediately after the incident supported her conclusion that Sudz had control of his actions, and that he therefore did not meet the legal requirements for an insanity defense. *Id*. at 28-30.

Shiener did not testify that the stabbings themselves were automatic or unconscious actions. The only example he gave for the type of automatic actions that a person might engage in as a result of taking sleeping pills was "you walk up to a door and you know to push it or if the door has a doorknob, you know to grab the doorknob." He characterized such automatic actions as tending to be "aimless" ones. *Id.* at 85. Later in his testimony, Shiener testified that the type of actions a person might perform when their consciousness is affected by sleeping pills involve "someone going through the motions, doing innocuous activities." *Id.* at 87. They involve "overlearned" actions that a person has done "so many times." *Id.* at 88.

Respondent asserts that stabbing a person dozens of times with a butcher knife is nothing like "going through the motions." It is not an "overlearned" automatic action like turning a doorknob. ECF No. 6, PageID.268-69. In fact, Shiener went on to testify after this discussion about automatisms that the medications, brain atrophy, and depression caused a "serious impairment of mood that interfered with Mr. Sudz's … ability to control his behaviors and manage his impulses, and to appreciate the wrongfulness of his actions at the time he acted" when he stabbed the victim to death. ECF No. 7-13, at 97. He did not testify that one can simultaneously be acting out of such an uncontrollably impaired mood and also be unconscious.

Sudz's rejoinder is extremely weak. Sudz notes that there was evidence presented at trial indicating that Sudz served in Viet Nam, and that violently stabbing someone might indeed be an automatic or reflexive action for a combat veteran. ECF No. 1, at 41, 43. There was no evidence offered, however, that Sudz

possessed such an unusual "overlearned" trait. The only evidence regarding Sudz's over four-decade-old involvement in Viet Nam was that he did not suffer from traumatic experiences there, much less that he engaged in so many stabbings that the stabbing someone became a candidate for a reflexive action while sedated. ECF No. 7-11, at 182, ECF No. 7-12, at 16.

Sudz cites cases suggesting that an automatism defense has nevertheless been raised in cases where a person fired multiple shots or engaging in other seemingly complex actions. ECF No. 1, at 42-43. But what Sudz does not cite is any evidence offered at his trial that the repeated stabbings here could have been an overlearned automatic involuntary action. Certainly, while there was testimony about the sleeping pills causing amnesia and Sudz not remembering anything after he took the second pill, there was no testimony equating the entire period of amnesia with an entire period of unconscious action. Shiener is the only witness who equated amnesia with unconscious action, but he referred only to "going through the motions" and "overlearned" actions as possibly being unconscious ones.

As the Court understands the defense experts' testimony, they opined that the anti-depressant drugs (and perhaps MMDA/ecstasy) combined with mental illness and brain atrophy caused Sudz to become uncharacteristically more aggressive and violent and to lack the impulse control to stop himself from stabbing his wife to death. Quite separately they believed that the sleeping pills accounted for his lack of memory of the incident. Finally, according to Shiener at least, the sleeping pills might also have accounted for Sudz's automatic actions of cleaning the knife and changing

out of his bloody clothes after the incident. This hypothesis is different from the hypothesis that Sudz now offers that he was acting unconsciously when he stabbed his wife to death.

Accordingly, there was no evidence presented at trial to support a jury instruction on automatism. There was simply no testimony offered that Sudz was acting unconsciously when he stabbed his wife dozens of times. And importantly, Sudz does not claim that his counsel was ineffective for failing to present such additional evidence. Counsel therefore did not perform deficiently under the *Strickland* standard for failing to request a defense instruction.

Turning to the second prong of the *Strickland* test, Sudz fails to demonstrate prejudice. He has not shown a reasonable probability that an instruction on automatism would have resulted in a more favorable trial outcome.

In instructing the jury on the elements of first-degree premeditated murder, the trial court informed the jury that it could only find Sudz guilty if it found the following elements beyond a reasonable doubt:

> First, that the defendant caused the death of Beth Alsup-Sudz; that is that Beth Alsup-Sudz died as a result of multiple blunt force injuries of her face and head.

> Second, that the defendant intended to kill Beth Alsup-Sudz.

> Third, that his intent to kill was premeditated; that it was thought out beforehand.

> Fourth, that the killing was deliberate, which means that the defendant considered the pros and cons of the killing and thought about and chose his actions before he did it. There must have been real and substantial reflection for long enough to give a reasonable person a

chance to think twice about the attempt to kill …. The killing cannot be the result of a sudden impulse without thought or reflection.

ECF No. 7-13, at 163.

By finding Sudz guilty of first-degree premediated murder, the jury necessarily found beyond a reasonable doubt that when Sudz caused the death of the victim he intended to kill her, he thought it out beforehand, he considered the pros and cons of killing her, he engaged in real and substantial reflection about killing her, and the killing was not the result of a sudden impulse. All these findings are inconsistent with an automatism defense.

The Court of Appeals noted "the modern trend is to treat automatism as negating the actus reus of the offense." *Sudz*, 2023 WL 2618197, at *4. And though the findings noted above pertain to the mens rea and not the actus reus, they are nevertheless findings that negate automatism. Weighing pro and cons and engaging in substantial reflection require conscious thought. If there is some psychological theory that allows for unconscious reflection and deliberation, no evidence for one was presented at trial. In the absence of evidence of such a theory and given the findings of fact the jury necessarily made by finding Sudz guilty of first-degree premeditated murder, there is no reasonable probability of a different outcome had the jury been instructed on automatism.

Accordingly, reviewing the issue de novo, Sudz fails to demonstrate either prong of the *Strickland* test. His counsel did not perform deficiently for failing to request an automatism instruction, and he was not prejudiced by the failure of the jury to receive the instruction. Sudz therefore fails to demonstrate cause to excuse

21

the procedural default of his due process claim. Furthermore, because the *Strickland* claim fails under de novo review, it follows that the state court adjudication of that claim was not unreasonable, and the claim therefore cannot form an independent basis for relief under § 2254(d). *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010) (correct state court decision is necessarily reasonable under AEDPA standard of review). The petition for writ of habeas corpus is therefore denied.

## C. Evidentiary Hearing

Sudz requests an evidentiary hearing. The only evidentiary proffer he makes consists of his trial counsel's affidavit. Trial counsel admits that she did not consider an automatism defense, and she states that she would have requested a jury instruction on automatism if she had been aware of the defense. ECF No. 1-2, PageID.92.

Accepting these assertions as true, it does not change the result. It does not change the fact that no evidence was presented at trial to support an automatism instruction. And it does not change the fact that the jury's determination that Sudz acted with premeditation and deliberation necessarily means that it also would have rejected an automatism defense. The motion for an evidentiary hearing is therefore denied. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (district court not required to hold hearing where habeas claims can be resolved against petitioner based on existing record).

IV. Certificate of Appealability

Before Sudz may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Sudz must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of Sudz's claims as they are devoid of merit. The Court will therefore deny a certificate of appealability.

V. Order

**THEREFORE, IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**SO ORDERED.**

Dated: January 7, 2026          s/F. Kay Behm
                               F. Kay Behm
                               United States District Judge

23